Filed 1/16/14  P. v. Kitchens CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LANARD LAMAR KITCHENS,<br><br>Defendant and Appellant. | F064844<br><br>(Super. Ct. Nos. 10CM1305 & 10CM0390)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Donna Tarter, Judge.

John Ward, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Peter W. Thompson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Lanard Lamar Kitchens was charged with attempted murder, evading a pursing peace officer, and other offenses based on his conduct following a traffic stop that occurred in May 2010.  In another criminal case, he was charged with robbery and assault, based on an incident that occurred in December 2009.  The two cases were consolidated for trial, and after a jury trial, Kitchens was convicted of all charges.

On appeal, Kitchens contends he was deprived of a fair trial because the trial court refused to sever the charges related to the December 2009 robbery from the charges related to the May 2010 attempted murder and evasion.  Recognizing that this issue was not properly raised with the trial court, he argues, in the alternative, that he received ineffective assistance of counsel because his attorney failed to object to the consolidation of the two cases.

We reject Kitchens's contentions and affirm the judgment.

### *FACTUAL AND PROCEDURAL HISTORIES*

*Pretrial and trial proceedings*

On August 17, 2010, the Kings County District Attorney filed an eight-count complaint against Kitchens.  The complaint alleged that, on May 9, 2010, Kitchens attempted to murder a peace officer and fled from a pursuing officer.  It further alleged that Kitchens transported and possessed methamphetamine, cocaine, and Ecstasy and was a felon in possession of a .38-caliber revolver.

On August 31, 2010, the district attorney filed a three-count complaint against Kitchens.  This complaint alleged that on December 31, 2009, Kitchens and codefendant Kayla Brown committed robbery and assault, and used a semiautomatic handgun in both offenses.

The prosecution moved to consolidate the two cases, and Kitchens's attorney did not object.  On December 13, 2010, the trial court ordered the cases consolidated, and a consolidated information was filed.

2.

The criminal proceedings were suspended from early January until November 2011, during which time the trial court found Kitchens not competent to stand trial and he was admitted to Atascadero State Hospital. On November 8, 2011, the trial court found Kitchens competent to stand trial and reinstated the criminal proceedings.

On November 16, 2011, Kitchens filed a motion for substitution of counsel, which the trial court treated as a *Marsden*[1] motion. The court denied the motion.

On December 2, 2011, the prosecution filed a 13-count first amended information against Kitchens. Related to the events of May 9, 2010, he was charged with: attempted murder of J. Tyler (§§ 664, 187, subd. (a), count 1)[2]; attempted murder of a peace officer, J. Tyler (§ 217.1, subd. (b), count 2); evading a pursuing peace officer while driving with a willful or wanton disregard for the safety of persons and property (Veh. Code, § 2800.2, subd. (a), count 3), driving on a highway in a direction opposite to lawful traffic during flight from a pursuing peace officer (Veh. Code, § 2800.4, count 4); possession of a firearm by a felon (former § 12021, subd. (a)(1),[3] count 5); transporting or importing into the state of California a controlled substance, to wit, methamphetamine, cocaine, and Ecstasy (Health & Saf. Code, § 11379, subd. (a), count 6); possession of a controlled substance for sale, to wit, methamphetamine, cocaine, and Ecstasy (Health & Saf. Code, § 11378, count 7); transporting or importing into the state a controlled substance, to wit, methamphetamine, cocaine, and Ecstasy (Health & Saf. Code, § 11352, subd. (a), count 8); and vandalism (§ 594, subd. (a), count 9). Related to the events of December 31, 2009, Kitchens was charged with: unlawfully and by means of force and

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118.

[2] Subsequent references are to the Penal Code unless otherwise noted.

[3] Former section 12021, subdivision (a)(1), has been renumbered section 29800, subdivision (a)(1), without substantive change, effective January 1, 2012. (*People v. Sanders* (2012) 55 Cal.4th 731, 734, fn. 2.) For brevity and clarity, we will cite section 12021, the applicable statute in this case, omitting "former."

fear taking personal property from Cheryl Gonzales (§ 211, count 10); assault upon Loretto Rico with a semiautomatic firearm (§ 245, subd. (b), count 11); making a criminal threat (§ 422, count 12); and possession of a firearm by a felon (§ 12021, subd. (a)(1), count 13).

With respect to counts 1 and 2, it was further alleged that Kitchens personally discharged a firearm (§ 12022.53, subd. (c)); with respect to counts 1, 2, and 10, it was alleged that Kitchens inflicted great bodily injury (§ 12022.7, subd. (a)); with respect to counts 1, 2, 3, 4, 10, and 11, it was alleged that Kitchens personally used a firearm (§§ 12022.5, subd. (a), 12022.53, subd. (b)); and, with respect to counts 6, 7, and 8, it was alleged that Kitchens was personally armed with a firearm (§ 12022, subd. (c)).

On February 27, 2012, a jury trial began. The prosecutor dismissed count 12 (criminal threats) and renamed count 13 (felon in possession of a firearm) as count 12. The prosecutor also deleted the allegations of "importing into the state" from counts 6 and 8, leaving the charge that Kitchens transported controlled substances.

On the morning of February 28, 2012, outside the presence of the jury, Kitchens told the court he wanted to have more say in his own defense. The court held another *Marsden* hearing, and then a *Faretta*[4] hearing to determine whether Kitchens was competent to represent himself at trial. The court found Kitchens mentally capable of representing himself, and relieved his attorney, who was to be standby counsel. Kitchens represented himself for a very short time and gave an opening statement to the jury. During a recess and before any witnesses were presented, Kitchens indicated that he wanted to enter a plea for the robbery and assault charges, but he would not admit to the firearm allegations because he did not use a real gun. He claimed the weapon used in the robbery was a pellet gun. Kitchens stated that he needed counsel, and the trial court

---

**4**      *Faretta v. California* (1975) 422 U.S. 806.

reappointed his previous attorney. His attorney represented Kitchens through the rest of the trial.

Kitchens entered a plea of guilty to count 10 (robbery), but he would not plead guilty to count 11 (assault with a firearm) because the offense itself involved use of a semiautomatic firearm, and he would not admit to use of a firearm.

On February 29, 2012, Kitchens entered a guilty plea to count 3 (evading a pursuing officer) and count 4 (driving in the wrong direction while fleeing from a pursuing officer). He also admitted he had suffered two prior felony convictions, an element of the offense for counts 5 and 12 (felon in possession of a firearm).

*Prosecution's case*

On December 31, 2009, Cheryl Gonzales went to the bank and then returned to her furniture store, the Hanford Bargain Center. As Gonzales walked toward the store, a person approached her and started beating her on the head and grabbed the bank bag. Gonzales screamed. She tried to protect herself and covered her head and closed her eyes. She opened her eyes for a brief moment and saw silver as it came down onto her head; she thought it was the butt of a gun. She was hit with something hard that broke her skin. After the fourth blow, she fell to the ground, and the assailant grabbed the bank bag and ran. She did not see the assailant's face, but was able to describe his clothes, height, weight, and race.

Gonzales tried to get up and staggered. She was bleeding. She went to the hospital for her injuries and received seven staples in three different places.

Loretto Rico was working at the Hanford Bargain Center that day. She noticed Gonzales pull up into the driveway and park her car. Rico had a question for Gonzales, so she started to walk out of the store to talk to Gonzales. As she reached the front door of the store, Rico heard screaming. She saw Gonzales with her hands up, holding a bank bag and trying to protect her head. A man with a gun stood over her and struck her three times; he said "Let it go," as he pulled the bank bag with his other hand. The assailant

5.

ran, and Rico ran after him. The assailant turned around and pointed the gun at her. He said something to effect of "I'll shoot you" and called her a bitch. At that point, Rico ducked and stopped chasing the man. No shots were fired during the incident.

Rico saw that the assailant was wearing a coat with a hood and he had a gun that was silver and large. The gun appeared to be a semiautomatic firearm. Rico was familiar with certain firearms because she had taken peace officer training in 2005 and the duty weapon was a semiautomatic handgun. At trial, Rico identified Kitchens as the man who attacked Gonzales.

Jason Verhoeven was working across the street from the Hanford Bargain Center on December 31, 2009. From his office, he heard screaming and then saw a woman struggling with an African-American man. Verhoeven saw that the assailant had a gun, and he called 911. He observed the assailant run west on Sixth Street and jump into the passenger side of a maroon Mercury Capri that was waiting at the corner of Sixth and Brown Street. The car sped away. Verhoeven identified Kitchens as the man he saw that day.

Kayla Brown testified that Kitchens was her boyfriend in December 2009, although they were not in a relationship at the time of trial. On December 31, 2009, she was with Kitchens near the Hanford Bargain Center. She was driving her red Mercury Capri. Brown stopped the car, and Kitchens got out and went around the corner. She did not see anything in his hands, but she thought he might have had a gun in his pocket because he often carried a firearm. Kitchens was gone for a couple minutes. When he returned, he rushed to get in the car and said "Go."

Later, Brown was in jail when she received a letter from Kitchens in which he wrote about shooting at a California Highway Patrol (CHP) officer. Brown told a detective about the letter. She told the detective that Kitchens carried either a silver or black gun. At the time of trial, Brown was serving a prison term for the robbery at the Hanford Bargain Center. She received no benefit for testifying at Kitchens's trial.

John Tyler is a peace officer for the CHP. On the evening of May 9, 2010, he was on duty as a traffic officer in Hanford. He saw a maroon Dodge Caravan with its license plate partially covered such that the registration stickers were not visible. The officer initiated a traffic stop by turning on his overhead lights. The Caravan came to a stop on the shoulder of the roadway, and Tyler got out of his patrol car and walked to the driver's side of the Caravan.

As Tyler approached the driver's window and started to say, "good afternoon, sir," he could see the driver's face. The driver looked angry, and Tyler thought, "he's going to punch me." Tyler flinched and, at the same instant, heard a gunshot which came from the driver's window. The first gunshot disoriented the officer, and then he heard another shot, which "kind of woke [him] up." He stumbled back and returned fire. After Tyler "unloaded all of [his] rounds," the Caravan started to pull away. He felt his head and there was blood coming from his ear. At trial, Tyler identified Kitchens as the driver of the Caravan who shot at him.

Tyler got back in his patrol car and pursued the Caravan. He activated his car's lights and siren. Kitchens ran a red light and a stop sign and drove at speeds of at least 85 miles per hour. Driving on a highway, Kitchens passed cars on the right-hand shoulder and drove eastbound in a westbound lane, driving into oncoming traffic and forcing five cars to the side of the road. Kitchens turned off the highway and then drove into a dirt field where a cotton crop was growing. Kitchens drove through about half of the field and then got out of the Caravan and began running. Tyler followed Kitchens in his patrol car and then got out of his car and chased him on foot.

Tyler had his tactical rifle with him, and he ordered Kitchens to stop. Kitchens looked back and put his hands up. Tyler had his rifle pointed at Kitchens, and Kitchens said, "Don't shoot, don't shoot, please don't kill me." Another CHP officer, Joseph Machado, arrived at the scene and handcuffed Kitchens. Additional law enforcement officers arrived. At the Caravan, officers saw that the passenger side sliding door was

7.

open and they found two people, later identified as Miguel Acuna and Desiree Shoals, lying in the rows of cotton. They were also handcuffed and placed in CHP patrol cars. Several items that appeared to be drugs were found in the Caravan. A K-9 officer and his dog located a black revolver in the dirt about midway between the Caravan and where Kitchens was apprehended.

Tyler suffered burn marks on his face from gunpowder residue. He has also lost 50 percent of his hearing in his right ear and suffers from constant ringing in his ears.

Desiree Shoals knows Kitchens because they share a mutual friend, Miguel Acuna. On May 9, 2010, Shoals and Acuna were passengers in Kitchens's burgundy-colored van. Acuna was in the front passenger's seat and Shoals was in the back. Shoals saw police lights flash in the rearview mirror, and Kitchens turned to Acuna and said, "Should I shoot him? Should I shoot him?" Kitchens pulled over, and the officer approached the van. Kitchens said, "What's the problem, Officer," and, as the officer began to speak, Kitchens reached his hand out the window and shot at the officer. Shoals saw fire by the officer's face. The officer returned fire, and the back window of the van shattered on Shoals.

According to Shoals, right after he fired a shot, Kitchens "instantly drove off." Kitchens said, "I thought I killed him, I thought I killed him." Acuna began throwing things out the window. He threw out cell phones, baggies —which Shoals believed contained drugs—and a gun. Shoals saw Kitchens was holding a handgun; it was black and the handle was brown.

Kitchens kept driving until they came to a cotton field, and a tire went flat. He then got out and ran. Shoals and Acuna got out of the van and went to the ground with their hands up.

Chris Fernandes, a Kings County Deputy Sheriff, investigated the scene where Kitchens was taken into custody. He identified the firearm found in the dirt as an RG 40,

8.

a type of revolver. The chamber of the revolver contained two live .38-caliber bullets and four spent casings, indicating that four bullets had been fired.

The field of cotton Kitchens drove through was damaged from the events of May 9, 2010. The farmer who planted the cotton crop lost about a bail and a half of cotton, which was worth approximately $1,000. The damage to the farmer's cotton crop was the basis for the charge of vandalism (count 9).

Robert Waggles, of the Kings County Sheriff's Department, was the lead investigator of the officer shooting. As part of his investigation, he monitored Kitchens's mail while Kitchens was held in jail. In his outgoing letters, Kitchens wrote about the shooting and the robbery. Kitchens wrote that he fired three shots at the CHP officer and he used hollow point bullets.

Waggles also searched the MySpace accounts of Kitchens and Acuna. He found photographs of Kitchens, Acuna, and Brown. One photograph from Kitchens's MySpace account showed a revolver that was similar in color, style, and shape to the revolver used in shooting Officer Tyler. The photo also showed a digital weighing scale and a stack of $100 and $50 bills fanned out on a desk. A photograph from Acuna's account showed Acuna and Kitchens together with Acuna holding what appeared to be a semiautomatic pistol. On cross-examination, Waggles agreed that the firearm in the photo could be a replica. Another photograph from Acuna's account showed Kitchens and Acuna sitting in a large red chair together. This photo was significant to Waggles because it appeared to depict a friendship between Kitchens and Acuna. Another photo from Acuna's account showed a revolver very similar to the one shown in the photograph from Kitchens's account, plus a cell phone, a stack of money, a glass jar filled with marijuana, and a plastic bindle containing something white.

### Defense

Kitchens testified on his own behalf. He admitted that he robbed Gonzales and "it was just a stupid move." The weapon he used during the robbery was the same gun

9.

Acuna was holding in the MySpace photograph. Kitchens said the gun was "a Hollywood prop" that did not fire. He knew the gun was inoperable because the slide did not slide back, the clip had a weight in it to make it feel solid, and there was a metal plug in the barrel; he said the metal plug was visible in the photograph. Kitchens did not have "a history of doing violent crimes" and he was "extremely scared" after the robbery. He admitted that he had committed "petty crimes, selling drugs, and petty thefts."

When he was pulled over by Officer Tyler, Kitchens was thinking that he wanted to die. He knew that he "had destroyed [his] life" when he committed the robbery. His intent was to "commit suicide by cop," referring to when a person fires a weapon at an officer, causing the officer to return fire and kill the person. On cross-examination, Kitchens claimed he had been suicidal ever since he saw himself on the news as a suspect in the robbery.

Kitchens stuck his upper body out the window and fired three rapid shots. He "put the gun parallel to [the officer's] head, not to impact it but on the side clearly parallel past his head." The officer flinched and the last shot gave him a powder burn. Kitchens testified, "I still had two more shots but I sat there and … I braced" "[f]or death."[5] He heard the back window shatter and the officer shot the rearview mirror. Then someone in the car yelled, "go." At that point, "adrenaline kicked in," and Kitchens "didn't want to die anymore." He denied saying, "I think I killed him," or anything about the officer. He was scared, and he did not want anyone to know he was trying to kill himself. He tried to commit suicide in 2003 by slicing his wrist. He denied throwing any drugs or cell phones out the window.

---

**5** On cross-examination, Kitchens explained that he bought the gun loaded, and he had fired one shot at the time he bought it. Therefore, there were five live cartridges in the gun when he was pulled over by Officer Tyler.

10.

Kitchens testified that he did not intend to kill Officer Tyler. He said it would be hard for him to miss at pointblank range with three shots.

Kitchens admitted that, prior to the robbery, he was a street-level drug dealer and he sold cocaine and Ecstasy, but he denied any prior knowledge of the drugs found in his minivan. He suggested the drugs had been in Acuna's backpack. Acuna also sold drugs, but Kitchens and Acuna were not partners in drug sales. Kitchens admitted that he had guns to protect himself.

### Jury verdict and sentence

On March 6, 2012, the jury found Kitchens guilty of all the remaining counts and found true the enhancement allegations of firearm use and great bodily injury. The trial court sentenced Kitchens to an indeterminate term of 40 years to life in prison, plus a determinate term of 44 years eight months.

He filed a notice of appeal on April 24, 2012.

## DISCUSSION

### I.     Consolidation of cases and "refusal" to sever

Kitchens contends that he was prejudicially deprived of a fair trial "by the court's refusal to sever the December 31, 2009 robbery from the May 9, 2010 shooting." This contention fails because Kitchens never raised this issue before the trial court, and, on the merits, consolidation of the two criminal cases was within the trial court's discretion.

### A.     Kitchens forfeited the issue

As a preliminary matter, Kitchens has forfeited this claim. Where a defendant "never asked the trial court to sever the case[], did not oppose the prosecutor's motion for consolidation, and never gave the trial court any explanation as to why joinder would prejudice him," the defendant may not raise the issue for the first time on appeal. (*People v. Champion* (1995) 9 Cal.4th 879, 906, overruling on another ground recognized in *People v. Combs* (2004) 34 Cal.4th 821, 860; see also *People v. Kopp* (1969) 275 Cal.App.2d 38, 40 ["Failure to object to consolidation … precludes appellant from urging

11.

that such consolidation was error on appeal."].) Here, Kitchens's attorney did not object to the People's motion to consolidate the two cases, and there is no evidence that a motion to sever was ever filed.

Kitchens attempts to avoid forfeiture by arguing that he, "inartfully, objected to consolidation and was cut off by the trial judge." He relies on a statement he made to the trial court on February 28, 2012, during the short period he represented himself. In a discussion outside the presence of the jury, Kitchens indicated that he wanted to plead guilty to the robbery and assault charges. He then asked the court why there was one trial for two different cases. The court responded that the cases were consolidated because they were the same class of crimes. Kitchens tried to interrupt, and the following brief colloquy occurred:

> "THE COURT: Mr. Kitchens I'm not going to argue with you. You asked a question and I answered it. They are the same class, they were consolidated in an earlier proceeding so we're not going to revisit that. [¶] Next question.

> "THE DEFENDANT: I'm just saying I never agreed to this.

> "THE COURT: All right.

> "THE DEFENDANT: Okay.

> "THE COURT: Thank you."

We disagree with Kitchens's premise that his statement to the court ("I never agreed to this") should have been construed as an objection to consolidation or, more appropriately, a motion to sever the two cases that had been consolidated 14 months earlier. Kitchens's statement did not affirmatively show that he wanted the two cases to be tried separately, and he did not try to explain how consolidation of the two cases would prejudice him. There was no reason for the trial court to understand Kitchens's

12.

statement, followed by, "Okay," as indicating any kind of objection or motion to the court.

Moreover, even if Kitchens's statement had been treated as a motion to sever, it would have been untimely. As the People point out, an objection to consolidation or motion to sever must be made "before the commencement of the trial." (*People v. Simms* (1970) 10 Cal.App.3d 299, 306.) Kitchens made his statement on the second day of trial, after opening statements. "Since the motion was not made before the commencement of the trial it was not timely, and, accordingly, any objection to the consolidated trial is deemed waived and not subject to review on appeal." (*People v. Burns* (1969) 270 Cal.App.2d 238, 251-252.)

### B.      *Consolidation was proper*

In any event, the trial court properly consolidated the two criminal cases. Had Kitchens raised the issue of severance, the court's order of consolidation would still have been within its discretion.

Section 954 sets forth rules of pleading for criminal matters. It provides that "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated." Not only is consolidation permitted, it is encouraged. Our Supreme Court has observed, "[B]ecause consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220.)

On appeal, Kitchens does not dispute that the December 2009 offenses of robbery and assault were "of the same class of crimes" as the May 2010 offense of attempted murder. (§ 954) Indeed, it is well settled that offenses that share the "common characteristics as … assaultive crime[s] against the person" are "of the same class of

13.

crimes," and, therefore, may be consolidated. (*People v. Rhoden* (1972) 6 Cal.3d 519, 524-525; § 954; see also *People v. Walker* (1988) 47 Cal.3d 605, 622 [robbery, murder, and assault with intent to commit murder are all assaultive crimes against the person and properly may be joined].) Since the robbery and assault offenses and the attempted murder offense were all assaultive crimes against the person, the trial court properly consolidated the two criminal cases pursuant to section 954.

Nevertheless, Kitchens contends the trial court abused its discretion by consolidating the charges because of the risk of prejudice to him. Section 954 does grant trial courts the discretion to sever different offenses "in the interests of justice and for good cause shown." "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Soper* (2009) 45 Cal.4th 759, 773 (*Soper*).) As we have seen, Kitchens did not raise the issue of severance, and so it is not surprising that he did not make any showing that there was a substantial danger of prejudice if the robbery and assault charges were tried together with the attempted murder and evasion charges. The trial court had no sua sponte duty to consider severance. (*People v. Maury* (2003) 30 Cal.4th 342, 392 [neither section 954 nor the federal or state constitutions imposes a duty of severance on trial courts].) For this reason, we reject Kitchens's characterization of the consolidation order as a "refusal" by the trial court to sever the cases. There was no motion to sever pending, and the trial court had no independent duty to consider the issue.

Even if we assume for the sake of argument that Kitchens raised a timely objection to consolidation or motion to sever, it would not have been an abuse of discretion for the trial court to consolidate the cases or deny the motion to sever. A trial court abuses its discretion by denying a motion to sever only if the ruling falls outside the bounds of reason. (*Soper*, *supra*, 45 Cal.4th at p. 774.)

In determining whether the trial court abused its discretion by declining to sever properly joined charges, "[f]irst, we consider the cross-admissibility of the evidence in hypothetical separate trials." (*Soper*, *supra*, 45 Cal.4th at p. 774.) "If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges. [Citation.] Moreover, even if the evidence underlying these charges would *not* be cross-admissible in hypothetical separate trials, that determination would not itself establish prejudice or an abuse of discretion by the trial court in declining to sever properly joined charges." (*Id*. at pp. 774-775.)

If the evidence would not be cross-admissible, the next consideration is "'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.]" (*Soper*, *supra*, 45 Cal.4th at p. 775.) This assessment involves "three additional factors, any of which—combined with … absence of cross-admissibility—might establish an abuse of the trial court's discretion: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges converts the matter into a capital case." (*Ibid*.) Finally, we "balance the potential for prejudice to the defendant from a joint trial against the countervailing benefits to the state." (*Ibid*., fn. omitted.)

Here, at least some of the evidence was cross-admissible. In particular, the MySpace photographs would have been admissible in a trial of the May 2010 charges to show that Acuna and Kitchens were friends and both appeared to possess and sell controlled substances. This evidence, in turn, would tend to show that Kitchens was aware of the drugs found in his minivan. The photographs of Acuna and Kitchens

together, including the photo with Acuna holding a semiautomatic pistol, would also have been admissible in the trial of the December 2009 charges to show that Kitchens had access to a semiautomatic firearm. Further, evidence of the crimes would likely have been admissible for impeachment purposes in light of Kitchens's defense theories. Kitchens's testimony that he did not intend to kill Officer Tyler and only wanted to provoke him in order to "commit suicide by cop," may have been impeached by evidence showing that he knew that he was suspected of a robbery at the time of the traffic stop. From this evidence, it could be inferred that Kitchens shot at the officer to avoid arrest, not to commit suicide.

Although the cross-admissibility of evidence is sufficient to justify denial of severance, we observe that the remaining factors do not support Kitchens's claim either. (*Soper*, *supra*, 45 Cal.4th at p. 774.) First, it does not appear that any of the charges would have been particularly likely to inflame the jury against Kitchens. Beating a woman with a firearm to steal money is no less inflammatory than shooting at a CHP officer. Second, the evidence for the two cases was equally strong. In both cases, there were eyewitnesses and Kitchens admitted the conduct. In both cases, Kitchens relied on his own testimony to dispute an allegation (intent for the attempted murder charge and use of a firearm for the robbery and assault charges). Third, consolidation did not convert the case into a capital case. In light of all these considerations, it would not have been an abuse of discretion for the trial court to consolidate the two cases even if Kitchens had objected to consolidation or requested severance.

## II.     *Ineffective assistance of counsel claim*

Kitchens argues, in the alternative, that he received ineffective assistance of counsel based on his attorney's failure to make a motion for severance. This argument lacks merit.

To prevail on an ineffective assistance of counsel claim, Kitchens must show both that his attorney's performance was deficient and that the deficiency caused him

16.

prejudice. (*People v. Cowan* (2010) 50 Cal.4th 401, 493, fn. 31.) When the reasons for an attorney's decisions are not apparent from the record, "'we will not assume inadequacy of representation unless counsel had no conceivable tactical purpose.' [Citation.]" (*People v. Hines* (1997) 15 Cal.4th 997, 1065.)

Here, the reasons that Kitchens's attorney declined to object to consolidation are not apparent from the record, and we will not assume inadequacy of representation.

Furthermore, Kitchens cannot show prejudice. We have concluded that it would not have been an abuse of discretion to consolidate the cases even if an objection or motion to sever had been raised. As a result, we "have no basis for concluding there was a reasonable probability that a motion for severance would have been granted. Ipso facto, we cannot conclude there was a reasonable probability that counsel's request for severance would have resulted in a verdict more favorable to defendant." (*People v. Hawkins* (1995) 10 Cal.4th 920, 941, fn. omitted [rejecting ineffective assistance of counsel claim based on failure to make a motion to sever where it would not have been abuse of discretion to deny motion had it been made], abrogated on another point by *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

Finally, there is no reasonable probability that Kitchens would have received a more favorable outcome even if a motion to sever had been granted and he was subject to two trials. There was strong evidence to support both cases, and Kitchens's testimony in each case was somewhat implausible and subject to impeachment.

## ***DISPOSITION***

The judgment is affirmed.

_____
                          Kane, J.

WE CONCUR:

_____
Levy, Acting P.J.

_____
Franson, J.

18.